UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

SENGMANY SAVATXATH,

                              Plaintiff,

    -v-                                         3:15-CV-82

DANIEL W. DEMER, Patrolman, Binghamton
Police Department, Individual and Official
Capacity, formerly known as P.O. Demar;
DANIEL D. BURNS, Patrolman, Binghamton
Police Department, Individual and Official
Capacity, formerly known as P.O. Burns; and
DANIEL D. BARTA, Patrolman, Binghamton
Police Department, Individual and Official
Capacity, formerly known as John Doe,

                              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                              OF COUNSEL:

SENGMANY SAVATXATH
Plaintiff pro se
16-B-2134
Elmira Correctional Facility
P.O. Box 500
Elmira, NY 14902

LEONARD & CUMMINGS, LLP              PATRICIA A. CUMMINGS, ESQ.
Attorneys for Defendants
84 Court Street
Suite 402
Binghamton, NY 13901


DAVID N. HURD
United States District Judge

## **TABLE OF CONTENTS**

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

II.    BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

    A.    The Submissions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

    B.    The Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7
        1.    Undisputed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7
        2.    Disputed:  Plaintiff's Version . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9
        3.    Disputed:  Defendants' Version  . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

III.    LEGAL STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

IV.    DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

    A.    Official Capacity Claims  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

    B.    The Amended Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

    C.    Impact of Plaintiff's Guilty Plea  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

    D.    Fourth Amendment and State Law Claims  . . . . . . . . . . . . . . . . . . . . . . . . .   25
        1.    Illegal Search and Seizure Claim  . . . . . . . . . . . . . . . . . . . . . . . . . . .   26
        2.    False Arrest and False Imprisonment Claims . . . . . . . . . . . . . . . . . . .   30
        3.    Excessive Force and Assault and Battery Claims  . . . . . . . . . . . . . . .   32
        4.    Malicious Prosecution Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   37

    E.    Fourteenth Amendment Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   38
        1.    Medical Indifference Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   39
        2.    Equal Protection Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   42
        3.    Due Process Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   44

    F.    Fifth Amendment Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   47

    G.    Failure to Intervene Claims  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   47

    H.    Americans with Disabilities Act Claim  . . . . . . . . . . . . . . . . . . . . . . . . . . . .   49

V.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   51

**MEMORANDUM-DECISION and ORDER**

## I.    INTRODUCTION

Pro se plaintiff Sengmany Savatxath ("Savatxath" or "plaintiff") filed this civil rights action seeking compensatory and punitive damages for injuries he sustained on October 11, 2013, when Binghamton Police Department Patrol Officers Daniel W. Demer ("P.O. Demer"), Daniel D. Burns ("P.O. Burns"), and Daniel D. Barta ("P.O. Barta") (collectively "defendants") stopped the vehicle in which he was a passenger.[1]  During the stop, defendants forcibly removed plaintiff from the vehicle, arrested him, and transported him to the Binghamton Police Department station where he was charged with a misdemeanor and later released.

The amended complaint contains seven counts, however, some of the counts contain multiple theories of liability.  Savatxath asserts federal claims against all defendants for excessive force, false arrest, malicious prosecution, illegal search and seizure, and medical indifference under 42 U.S.C. § 1983.  He also brings state law claims for assault and battery, false imprisonment, and malicious prosecution.[2]  Plaintiff asserts all claims[3] against the defendants in their individual and official capacities.

---

[1]  The parties have since stipulated to the dismissal of defendants City of Binghamton, Binghamton Police Department, and its Chief of Police Joseph Zikuski.

[2]  In plaintiff's seventh and final cause of action, he asserts a claim for "False Arrest and False Imprisonment," alleging P.O. Burns and P.O. Demer injured him by "Falsifying Charges against [him] Forcing him to be imprisonment [sic]."  Am. Compl. ¶ 91.  Although plaintiff does not use the term "malicious prosecution," it is clear he intended to assert both false arrest and malicious prosecution claims in this cause of action.

[3]  Plaintiff's amended complaint references his race and disability as well as the terms "due process" and "equal protection," in addition to the aforementioned claims.  In most counts, plaintiff has alleged multiple wrongs, which if true, could give rise to multiple constitutional violations.  See Soldal v. Cook Cnty., Ill., 506 U.S. 56, 70 (1992) ("Certain wrongs affect more than a single right and, accordingly, can implicate more than one of the Constitution's commands").  The extent to which plaintiff can maintain any such claims is discussed in more detail below.

Very little discovery has taken place in this case, and no depositions taken despite at least six individuals being present during the bulk of the events in question. Yet in September 2016, defendants collectively moved for summary judgment under Federal Rule of Civil Procedure ("Rule") 56. Plaintiff, after being given numerous extensions of time in which to do so, filed an opposition to defendants' motion. No reply has been submitted. The motion was taken on its submissions, without oral argument.

## II.    **BACKGROUND**

### A.    **The Submissions**

Before reciting the facts material to defendants' motion for summary judgment, a few comments are appropriate regarding the parties' submissions. First, it is impressive that defendants were able to articulate the entire October 11, 2013 incident in merely nine paragraphs in their Statement of Material Facts pursuant to Northern District of New York Local Rule 7.1(a)(3) of the Court's Local Rules of Practice ("Rule 7.1 Statement"). See Defs.' Rule 7.1 Statement in Support of Mot. ("Defs.' SMF"). Defendants' brief summary of the incident provides little detail as to the precise timeline of the traffic stop nor the particulars of each defendants' interactions with plaintiff and the other passengers. Moreover, defendants have failed to submit any fact affidavits from those with personal knowledge of the facts and circumstances of this incident. Instead, by way of the affidavit from defendants' attorney, they have submitted copies of their Rule 26 disclosures to plaintiff, plaintiff's answers to their interrogatories, multiple police reports, court documents, and voluminous medical records detailing plaintiff's lengthy medical history.

Defendants remain confident that despite plaintiff's entirely different version of the events at issue, and despite relying exclusively on police reports and court documents and

having submitted no deposition transcripts or fact affidavits from defendants or any other individual involved in this case, they are entitled to judgment dismissing plaintiff's entire amended complaint as a matter of law.  In fact, the only sworn testimony submitted by defendants in connection with this motion is a portion of a transcript of a suppression hearing on August 24, 2014 in state court in which plaintiff, represented by counsel, testified under oath regarding this incident.  See Defs.' SMF ¶ 19; Cummings Aff., Ex. 3.  It is equally impressive that defendants managed to fit all of their arguments in support of dismissing plaintiff's entire 35 page, 103 paragraph amended complaint,[4] within only 11 and one half pages of a memorandum of law while most parties at the summary judgment stage fill to the brim their memoranda or eagerly request an extension of the 25 page limit.

Putting aside a desire for more from defendants' papers and moving on to plaintiff's opposition, a few things should be noted.  It is well established that a court is obligated to afford some degree of special solicitude to pro se litigants, Tracy v. Freshwater, 623 F.3d 90, 101 (2d Cir. 2010) (collecting cases), "particularly where motions for summary judgment are concerned," Jackson v. Fed. Express, 766 F.3d 189, 195 (2d Cir. 2014).  That solicitude takes a variety of forms including, inter alia, a "liberal construction of pleadings, motion papers, and appellate briefs."  Tracy, 623 F.3d at 101.  Further, while "[t]he appropriate degree of special solicitude is not identical with regard to all pro se litigants," the Second Circuit can often be found encouraging district courts to provide extra solicitude to pro se litigants who assert civil rights claims.  Id. at 102 ("We have sometimes suggested that a

---

[4]  Though length of a complaint correlates with merit as equally often as not, the length of plaintiff's amended complaint is only mentioned because he goes into great detail as to the events at issue.

court should be particularly solicitous of pro se litigants who assert civil rights claims.") (citing Davis v. Goord, 320 F.3d 346, 350 (2d Cir. 2003)).

Pro se plaintiffs in this District are afforded special solicitude and are provided a copy of the Court's Pro Se Handbook, which was mailed to Savatxath on July 9, 2015. Additionally, in conjunction with defendants' summary judgment motion, the Court served plaintiff with a copy of the Notification of the Consequences of Failing to Respond to a Summary Judgment Motion, which also advised Savatxath of the requirements of Local Rule 7.1(a). Technically, plaintiff's response to defendants' Rule 7.1 Statement does not comply with Local Rule 7.1(a)(3) of the Court's Local Rules of Practice because it does not "mirror" defendants' submission "by admitting or denying Defendant's assertions in matching numbered paragraphs." N.D.N.Y. L.R. 7.1(a)(3). Rather, Savatxath has filed a 93 page document, which is half typed and half handwritten, consisting of 172 numbered paragraphs. See Pl.'s Rule 7.1 Statement in Opp'n to Mot. ("Pl.'s SMF"). However, the Second Circuit frowns upon the "harsh application of technical rules" to pro se plaintiffs, Traguth v. Zuck, 710 F.2d 90, 95 (2d Cir. 1983), and his submissions will be considered with the solicitude required.

Though not "matching up" numerically and difficult to comb through, plaintiff's lengthy responsive Statement of Material Facts—replete with actual portions of the record, including state court testimony, answers to interrogatories, and medical reports—does contain responses to each and every one of defendants' asserted facts. Moreover, he has submitted his own affidavit, with 41 attached exhibits containing largely useful information. Savatxath notes that he requested to take depositions of the defendants but defense counsel failed to schedule a date and time while he was incarcerated on an unrelated matter. Further, he

attempted unsuccessfully to solicit defense counsel and the City of Binghamton Corporation Counsel's office in locating two fact witnesses who were at the scene of the incident, for the purpose of taking depositions or obtaining written statements from those witnesses.

With these considerations in mind, the parties' submissions have been carefully reviewed for any factual disputes which are supported by the record. The following recitation is derived from the record now before the Court, including Savatxath's verified amended complaint, with all inferences drawn and ambiguities resolved in plaintiff's favor as the non-moving party. Terry v. Ashcroft, 336 F.3d 128, 137 (2d Cir. 2003).

**B.    The Facts**

**1.    Undisputed**

On October 11, 2013, Savatxath was shopping at a "dollar store" in Binghamton, New York. Plaintiff, who suffers from narcolepsy and cataplexy,[5] called his friend Stanley for a ride to a nearby gas station. A short time later, Stanley arrived in a silver Chevrolet to pick Savatxath up on Ely Street in Binghamton. The Chevrolet was owned and operated by Stanley's friend Nora. Stanley was in the front passenger seat. Plaintiff got in the rear of the

---

[5] According to the National Institute of Health's National Institute of Neurological Disorders and Stroke, "[n]arcolepsy is a chronic neurological disorder that affects the brain's ability to control sleep-wake cycles. People with narcolepsy usually feel rested after waking, but then feel very sleepy throughout much of the day. Many individuals with narcolepsy also experience uneven and interrupted sleep that can involve waking up frequently during the night. Narcolepsy can greatly affect daily activities. People may unwillingly fall asleep even if they are in the middle of an activity like driving, eating, or talking. Other symptoms may include sudden muscle weakness while awake that makes a person go limp or unable to move ([also known as] cataplexy) . . . ."
https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/Fact-Sheets/Narcolepsy-Fact-Sheet
The parties dispute plaintiff's actual medical diagnosis, with defendants claiming the conditions are self-diagnosed and without merit. Voluminous medical records have been submitted on the issue by both sides. Whether plaintiff has actually been diagnosed with these conditions is not of significance for the instant discussion. It is undisputed that plaintiff, at some point, advised the officers that he suffered from a medical condition.

vehicle and the three drove to Weis Market at 160 Robinson Street. Nora parked the vehicle and went inside Weis Market.

Meanwhile, officers of the Binghamton Police Department Community Response Team were conducting surveillance in the area of 160 Robinson Street, a location known to officers for steady drug activity.[6] Defendant P.O. Burns, accompanied by defendant P.O. Barta,[7] both working in a uniform capacity and operating a marked police vehicle, observed a male sitting in the front passenger seat of a parked silver Chevrolet in the northern lot of the Weis Market. P.O. Burns observed only this male passenger at the time and took notice that the vehicle was parked in an area of the lot fairly far from the store entrance despite closer available spots.

After circling the area, P.O. Burns saw the same vehicle, with the same front seat male passenger, now exiting the southern lot. A female was driving, and the vehicle also now had a rear male passenger. Based on his experience, P.O. Burns considered this vehicle and behavior consistent with the purchasing and/or selling of drugs. As the vehicle exited the lot, P.O. Burns observed that the driver's view was obstructed as a result of an object hanging from the rearview mirror and proceeded to conduct a traffic stop of the vehicle.

Upon stopping the vehicle, P.O. Burns approached the driver, who identified herself as Nora. He asked for Nora's license which she produced. Shortly after P.O. Burns and P.O.

---

[6] Plaintiff disputes this characterization, and notes the various reasons people park in this lot ranging from employees and customers using the bank, nail salon, hair salon, Chinese restaurant, and liquor store, among other places in the instant shopping plaza.

[7] P.O. Barta was in training on the date in question. He was accompanying P.O. Burns but was more or less observing.

Barta effected the traffic stop, defendant P.O. Demer, working in a plain clothes capacity and driving an unmarked police vehicle, responded to the scene to assist.

Here, the accounts of the parties dramatically and critically diverge.

### 2.   Disputed:  Plaintiff's Version

According to Savatxath, P.O. Burns, P.O. Barta, and P.O. Demer were initially all on the driver's side of the vehicle, speaking to Nora.  Plaintiff asked the officers if he could leave the vehicle and go on his way, but P.O. Demer advised he could not leave and encouraged him to be patient and wait, that it would be a quick traffic stop, and the driver would be receiving a ticket for an obstructed rearview mirror, and then he could go about his business. At or around this time, P.O. Demer demanded plaintiff's identification, which he provided. Savatxath questioned the basis for the stop and also advised the officers about his medical conditions, namely that he suffers from narcolepsy and cataplexy.

Also at or around this time, P.O. Burns asked Nora if she would step out of the vehicle to be questioned by P.O. Demer.  She complied and stated she was coming from Weis Market where she had taken her friend Stanley shopping.  Savatxath continued to question P.O. Demer about why he was being denied "movement."  Am. Compl. ¶ 20.  P.O. Demer ignored the questions and advised him to follow directions or he would be arrested.  P.O. Demer advised P.O. Barta to watch plaintiff and Stanley while he and P.O. Burns questioned Nora.  Officers searched Nora and found nothing.  In the meantime, Savatxath spoke with P.O. Barta, again advising him of his cataplexy attacks.  P.O. Demer then returned to the vehicle and ordered Stanley to step out, which he did.  P.O.s Demer and Burns searched Stanley and found nothing.  P.O. Demer then ordered P.O. Barta to watch Nora and Stanley while he questioned plaintiff.

P.O. Demer advised Savatxath that this was a drug investigation and inquired if he had drugs on him, to which he replied no and also refused to consent to a search. P.O. Demer then became aggressive and ordered Savatxath out of the vehicle. P.O. Demer attempted to open the rear passenger side door where plaintiff was sitting and realized it was locked. He proceeded to be "very violently aggressive," ordering Savatxath to unlock the door and step out. Am. Compl. ¶ 42. Plaintiff became frightened and terrified for his safety, and while he attempted to unlock the door, he suffered a cataplexy attack. He asserts that he suffered the attack and lost muscle tone in his body due to P.O. Demer's "maliciously violently aggressive verbally and physically behavior misconduct." Id. ¶ 43.

Savatxath avers he never resisted arrest or offered violence against any defendant, nor was he ever told he was under arrest. Id. ¶ 44. He contends that only 15 to 20 seconds elapsed from the time P.O. Demer told him to get out of the vehicle, to when P.O. Demer "physically grabbed and yanked," Pl.'s SMF ¶ 101, plaintiff out of the vehicle, and "maliciously slamed [sic]" him on the trunk of the vehicle, Am. Comp. ¶ 45. At this time, P.O. Burns joined in to assist in handcuffing plaintiff. Savatxath maintains that he was never told he was under arrest or why he was being handcuffed.

Plaintiff claims he could not maintain his balance once outside the vehicle while handcuffed, and was "maliciously slamed [sic] to the black top ground Face First (basically it was a Face Plant on the hard, rough black top ground)." Am. Compl. ¶ 45. He alleges he was "maliciously fully slammed to the ground" by the officers, "with both of their weight on top" of his back (estimated to be 400-500 pounds), "while he hit the ground full force." Pl.'s

SMF ¶ ¶ 102, 103.  Savatxath asserts that the "face first" takedown "felt like a 'UFC' tactic move.[8]"  Id. ¶ 103.

While on the ground, P.O. Demer and P.O. Burns "physically Assaulted" plaintiff.  Id. ¶ 102.  They proceeded to "assault[ ] (Punches, Elbows and Knees)" and "beat Plaintiff's person brutally," and P.O. Demer put plaintiff in a "choke hold."  Am. Compl. ¶ 46.  The two continued to knee and hit him while he was on the ground.  Pl.'s SMF ¶ 65.  As a result, plaintiff's face was "all bruised up."  Id.  He estimates that the attack lasted at least five minutes, and the defendants kept "going on and off" and were "pulling" and "twisting" him.  Id.  During the attack, P.O. Demer directed racial slurs at plaintiff, including telling him to "Stop Faking it you Cry Baby Gook"[9] numerous times.  Am. Compl. ¶ 47.  Savatxath was handcuffed during the entire alleged attack.

According to plaintiff, following the assault, his face was covered with blood, he had lacerations above his head which left permanent scars, and he suffered cuts, abrasions, contusions, and back injuries later known to be sciatic nerve pain.  Id. ¶ 54.  P.O.s Demer and Barnes proceeded to search plaintiff and found nothing.  Savatxath claims that at one point, P.O. Demer "stuck his hand in [plaintiff's] underwear to search For hidden illegal drugs in the 'buttocks and groin' area."  Id. ¶¶ 49, 50.  He alleges that P.O. Barta witnessed the entire attack and knew about his medical conditions, but failed to do anything.

---

[8]  The "UFC," or Ultimate Fighting Championship, is an American mixed martial arts organization based in Las Vegas, Nevada.  The UFC style of fighting originated "from the full contact sport of Vale tudo in Brazil" and "was created in the United States in 1993 with minimal rules, and was promoted as a competition to determine the most effective martial art for unarmed combat situations."  http://www.ufc.com/discover/sport

[9]  According to Merriam-Webster's, the term "Gook" is defined as, "offensive:  a nonwhite or non-American person; specifically :  Asian."  Plaintiff has identified himself in his amended complaint as Asian-American.

At this time, plaintiff requested that an ambulance or emergency response team be called due to the injuries he sustained during the assault. Defendants denied plaintiff's request for medical treatment. P.O. Demer then transported plaintiff to the Binghamton Police Department while everyone else remained on scene.[10] As P.O. Demer continued to question Savatxath en route, his face continued to drip blood. Id. ¶ 62. Plaintiff ignored his questions and P.O. Demer began using racial slurs, including "Don't worry 'Gook,' they gonna take good care of you in prison." Id. ¶ 68.

After arriving at the police station, P.O. Demer handcuffed plaintiff to a steel bar above a wooden bench. After several hours, he returned, unhandcuffed him, and led him to an interview room. At the end of the interview, plaintiff again requested medical treatment. P.O. Demer led him back to the wooden bench where he was handcuffed back to the bar. P.O. Demer returned approximately 15 to 20 minutes later and Savatxath again requested medical treatment. P.O. Demer denied his requests and advised, with a smirk on his face, that plaintiff could walk to the General Hospital located on the Southside of Binghamton. Id. ¶ 82.

Savatxath was photographed, fingerprinted, and issued an appearance ticket to appear at Binghamton City Court on October 18, 2013. He was charged with Obstructing Governmental Administration in the second degree, a class A misdemeanor. Plaintiff's entire detainment on October 11, 2013 lasted approximately five hours.

On or about October 12, 2013, the day following his release, Savatxath contacted his primary care doctor to be seen for the injuries he sustained during the assault. He scheduled an appointment for October 18, 2013.

---

[10] Nora was ticketed for an obstructed view and aggravated unlicensed operation of a vehicle in the third degree. Stanley was ticketed for loitering. No contraband was ever found as a result of the traffic stop.

Also on October 18, 2013, plaintiff appeared at Binghamton City Court, was arraigned on the obstruction charge, and entered a plea of not guilty.

A bench warrant was later issued for Savatxath's appearance.[11]  On March 13, 2014, he was arraigned on the bench warrant and bail was set.  Although it is not clear, presumably plaintiff did not make bail because he contends he was detained at the Broome County Correctional Facility until April 14, 2014.

### 3.    Disputed:  Defendants' Version

Defendants largely dispute plaintiff's version of the events.  According to P.O. Burns, at the beginning of the traffic stop, Nora provided her license and exited the vehicle by request.  She stated she was coming from Weis Market, where she had taken her friend Stanley shopping.  P.O. Burns asked about her vehicle's parked position in relation to the store as well as her traffic pattern exiting the lot.  She responded that she started going the wrong way when leaving and changed course.

When asked, Nora stated that she did not know who the rear passenger was, but that he was a friend of Stanley's and the two had met at Weis Market.  P.O. Burns explained to Nora what he had observed and why he believed there to be drugs in the vehicle.  She denied knowing anything about drugs and maintained her story that she was merely providing her friend a ride.  As they were speaking, a license check came back and showed her license to be revoked.  P.O. Burns advised Nora of this to which she responded she would be honest with him if the officers would refrain from towing her vehicle.

---

[11]  Plaintiff mentions this was due to his missing a pre-trial conference in the criminal matter.

According to defendants, Nora then advised P.O. Burns that she was in fact giving Stanley a ride to the store, but that he was also meeting the rear passenger, later identified as plaintiff, so that Stanley could buy crack cocaine from plaintiff. Nora stated that they had picked Savatxath up and he had told them to drive to Weis Market but that he did not yet have a chance to deal the drugs because they were pulled over.

P.O. Demer contends that when he arrived on scene, P.O. Burns was already interviewing Nora, and he began interviewing Stanley, who was known to him based on past interactions related to drug activity and misdemeanor traffic offenses. P.O. Demer claims that after he caught Stanley in several lies, Stanley admitted they had picked up plaintiff to buy a "fifty piece" (of crack cocaine) for Nora but that the deal was never made because of the traffic stop. P.O. Demer denies that plaintiff ever asked to leave the scene and contends plaintiff only advised defendants about his narcolepsy, and not in detail.

P.O. Demer asserts that he advised P.O. Burns of Stanley's story, to which P.O. Burns responded with Nora's admission about picking plaintiff up to buy drugs. At this time, P.O.s Demer and Burns asked Savatxath to exit the vehicle. He refused and began questioning the officers about the traffic stop and asking why he needed to get out of the vehicle. After advising Savatxath about the suspected drugs, and his denying any involvement, they again asked him to exit the vehicle and he refused, instead saying he was thirsty and needed a drink.

At this time, P.O. Demer reached in through the open passenger side rear window, unlocked the door, opened it, and again told plaintiff to get out. According to P.O. Burns, P.O. Demer took hold of Savatxath's right arm to try to guide him out of the car. When he still did not comply, P.O. Demer took a hold of his wrist to prompt him out. Once partially out of

the vehicle, plaintiff began pulling away from him, so he pulled plaintiff from the vehicle using a wrist lock and then handcuffed him. P.O. Burns grabbed a hold of plaintiff's other wrist to assist. The officers placed him up against the outside of the vehicle and handcuffed him.

Once handcuffed, Savatxath's body slumped to the ground. P.O. Burns asserts he began causing a scene and allowed his body to fall to the ground. Defendants maintain that Savatxath never told them he had a disability or that his body seizes up, loses muscle tone, or goes weak in stressful situations. P.O. Demer pulled plaintiff back to his feet and held him against the vehicle but he slumped to the ground again.

After falling to the ground a third time, P.O. Demer rolled plaintiff to his stomach and kept him on the ground. He claims Savatxath started crying and screaming saying he had narcolepsy and that was what was wrong with him. He proceeded to writhe around on the ground and rub his face on the black top. P.O. Demer had plaintiff stand up and walk to his police vehicle, which, according to P.O. Demer, plaintiff was able to do by himself.

P.O. Burns later testified in Savatxath's suppression hearing on the obstruction charge, that when Savatxath "fell down a third time . . . Officer Demer kind of left him on the ground. And I got him up to his feet and put him in the back of the vehicle." Cummings Aff., Ex. 3. He testified that he did not use physical force against plaintiff, there was no physical altercation between Savatxath and himself, or Savatxath and P.O. Demer. Instead, he contends plaintiff's "whole body jerked over to the driver's side as if he were going to go out the driver's side." Id. Further, he "fell softly to the ground." Id.

During P.O. Demer's subsequent interview of plaintiff at the police station, he advised Savatxath that he was being charged with Obstructing Governmental Administration in the second degree, a class A misdemeanor. The basis for the charge was plaintiff's refusal to

exit the vehicle.  P.O. Demer contends Savatxath continued to be uncooperative at the

station and when he stated he needed medical attention, P.O. Demer advised he would be

getting a ticket and he could then walk to the hospital.  P.O. Demer claims Savatxath had no

visible injuries.  A color booking photograph, submitted by defendants, seems to corroborate

this contention.  See Cummings Aff., Ex. 2.

According to defendants, plaintiff was later charged and arraigned on several other,

unrelated crimes.  On September 2, 2014, he was charged with Criminal Possession of a

Weapon in the third degree, a Class D felony, and Criminal Possession of a Controlled

Substance in the seventh degree, a Class A misdemeanor.  See Cummings Aff., Ex. 4

("Certificate of Disposition").  On September 9, 2014, in Endicott Village Court, Broome

County, New York, Savatxath pleaded guilty to the reduced charge of New York Penal Law

section 265.01 Criminal Possession of a Weapon in the fourth degree, a Class A

misdemeanor, in full satisfaction of the following charges:  (1) Petit Larceny, Vestal, New

York, May 27, 2014; (2) Petit Larceny, Binghamton, New York, August 11, 2014; and (3)

Obstructing Governmental Administration, Binghamton, New York, October 10, 2013.  He

was sentenced on September 9, 2014.  Id.

With respect to defendants' version of the facts, plaintiff disputes that Nora or Stanley

ever told defendants that they picked him up to buy drugs from him.  In fact, he alleges that

P.O. Demer made up the entire story to support his theory that they were engaging in a drug

transaction.  He points out that defendants have failed to submit affidavits from Nora or

Stanley, and that the record is lacking a police report from P.O. Barta regarding the other

defendants' interactions with Nora and Stanley.  Savatxath asserts that by P.O. Demer

interrogating and searching Nora first before going to Stanley, the timeline of which is in

dispute, he had an opportunity to fabricate the story. Plaintiff points out that P.O. Demer's

initial encounter with Nora, upon arriving on the scene, is not included in his police report.

While Savatxath refutes that Nora ever implicated him, he also accuses defendants of playing

"mind games" with her by "manipulating her with false information" and "threaten[ing] to take

her vehicle away." Pl.'s SMF ¶ 28. According to plaintiff, if Nora truly did lie and make the

alleged statements, she only did it so her vehicle would not be towed.

Savatxath contends that P.O. Demer "maliciously fabricated" the police report

including his assertion that he caught Stanley in several lies. He alleges this is so since P.O.

Demer could not later remember what Stanley's alleged lies were. In fact, plaintiff asserts

that after he was released on October 11, 2013, he stopped at Stanley's house to find out the

truth and Stanley denied implicating plaintiff.[12]

Moreover, plaintiff maintains that he cooperated with defendants fully and answered all

of P.O. Demer's questions, but admits that he did not want to exit the vehicle based on his

impression of how the stop was proceeding. Id. ¶¶ 70, 71. This is why he continued asking

P.O. Demer why he had to step out. Id. ¶ 72. He also contends that he had no opportunity to

unlock the door or any chance to exit the vehicle voluntarily because of his cataplexy attack

and how quickly P.O. Demer reached in to open the door. Id. ¶ 103. Further, he was not

intentionally leaning away, never pulled away, never tried to dive out of the driver's side door

or run, and never yanked his arm away from P.O. Demer. Id. ¶¶ 66, 67. Instead, he was

suffering a cataplexy attack which caused his entire body to lose muscle tone and become

weak.

---

[12] Of course, while hearsay, Savatxath contends that "Stanley had told [him] that he never had told Defendant Ptl. Demer that he was buying Crack-Cocaine from Plaintiff, Defendant Ptl. Demer had told him that Plaintiff was there to buy Crack-Cocaine from Him (Stanley)." Pl.'s SMF ¶ 60.

Finally, plaintiff disputes defendants' assertion that he pleaded guilty to the obstruction charge. He claims he "did not plead guilty to the charge of Obstructing Governmental Administration @ all in Village Endicott Court; which they have No Jurisdiction to this charge. This charge was Dismissed by the Broome County District Attorney Office. See Exhibit O." Pl.'s SMF ¶ 121.

## III.    **LEGAL STANDARD**

The entry of summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).

A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248; see also Jeffreys v. City of N.Y., 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

The party seeking summary judgment bears the initial burden of demonstrating that there is no genuine issue of material fact to be decided with respect to any essential element of the claim. Anderson, 477 U.S. at 250 n.4. The failure to meet this burden warrants denial of the motion. Id. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Id. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party. Jeffreys,

426 F.3d at 553.  Accordingly, summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor."  Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted); see also Anderson, 477 U.S. at 250 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

Where, as here, a party is proceeding pro se, the court must "read his supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994).  Moreover, plaintiff's verified complaint "is to be treated as an affidavit for summary judgment purposes, and therefore will be considered in determining whether material issues of fact exist."  Colon v. Coughlin, 58 F.3d at 872.  Nonetheless, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## IV.    DISCUSSION

Generally, in support of their motion for summary judgment, defendants argue all claims fail as a matter of law because there was probable cause to arrest plaintiff, he did not sustain any injury at the time of his arrest, the search of his person was incident to his arrest, he was not in need of any medical treatment, and he pleaded guilty to the charge for which he was arrested.

Liberally construed, plaintiff's opposition argues there was no reasonable suspicion to conduct a traffic stop, no probable cause to arrest him, he did not resist or obstruct the officers at all but instead suffered a cataplexy episode rendering him physically unable to cooperate in the manner defendants desired, he was injured when defendants forcefully

removed him from the vehicle and assaulted, arrested, and unlawfully searched him, he was denied medical treatment on multiple occasions, and he did not plead guilty to the charge at issue.

To reiterate, the parties provide differing accounts of the events which transpired after defendants initiated the traffic stop. In summary, defendants contend that after Nora's license came back revoked, she admitted that plaintiff was dealing drugs. At the same time, Stanley admitted that plaintiff was dealing drugs. Under these facts, defendants assert they certainly had reasonable suspicion, if not probable cause, to extend the length of the traffic stop and continue the drug investigation. This, coupled with plaintiff's refusal to answer questions or exit the vehicle, resulted in probable cause to arrest plaintiff on the obstruction charge. Defendants' version is set forth in their Statement of Material Facts as well as in the accompanying exhibits to Attorney Cummings' affidavit, specifically P.O. Demer and Burns' Incident Supplement reports, Ex. 1. Again, no affidavits from the officers themselves or anyone else on scene have been provided.

By contrast, plaintiff's version is that either Nora and Stanley both lied *or* P.O. Demer fabricated their statements. If Nora and Stanley lied, it likely would not change the legal result because an officer is entitled to rely on those statements at that moment, absent facts to the contrary. However, if P.O. Demer fabricated the statements, then he impermissibly extended the length of the traffic stop; this is so because assuming, arguendo, there was reasonable suspicion to stop the vehicle based on suspected criminal activity afoot or probable cause to stop the vehicle for the traffic violation of an obstructed rear view mirror, and then during the initial investigation from that stop, the officers developed probable cause for another crime—that is, driving without a license. However, defendants could not simply

- 20 -

alter the investigation to a drug one unless they learned of new facts or evidence on which to do so. According to plaintiff, nothing allowed the officers to extend the stop because Nora nor Stanley said what defendants claim they said. Therefore, plaintiff contends the stop was impermissibly extended and everything that followed was improper. Plaintiff's version is set forth in his Statement of Material Facts and his verified amended complaint. Again, he has provided no affidavits or evidence from anyone else on the scene.

### A.    Official Capacity Claims

At the outset, all claims against defendants in their official capacities must be dismissed. The Eleventh Amendment protects states against suits brought in federal court. Alabama v. Pugh, 438 U.S. 781, 782 (1978). The immunity granted to the states under the Eleventh Amendment extends beyond the states themselves to state agents, and, unless waived, bars all money damage claims against state officials acting in their official capacities. Kentucky v. Graham, 473 U.S. 159, 167-68 (1985).

As a result, Savatxath's claims for money damages against defendants P.O. Demer, P.O. Burns, and P.O. Barta in their official capacities will be dismissed on Eleventh Amendment grounds.

### B.    The Amended Complaint

The amended complaint contains seven separate causes of action, though some counts assert multiple violations under various law. Before delving into the legal arguments, the seven counts in the amended complaint must be explored.

In Count I, plaintiff alleges defendants physically abused him, deprived him of equal protection of the laws, and impeded the due course of justice, all in violation of the Fifth and Fourteenth Amendments. First, this cause of action is liberally construed to allege an

excessive force claim pursuant to the Fourth Amendment.  For the reasons discussed below, this cause of action does not give rise to a Fourteenth Amendment equal protection or due process claim, nor a Fifth Amendment due process claim.

In Count II, plaintiff alleges defendants never informed him of the grounds for his warrantless arrest, and as a result of that arrest without probable cause, defendants deprived him of liberty without due process and deprived him of equal protection of the laws, all in violation of the Fifth and Fourteenth Amendments.  First, this cause of action is liberally construed to allege a false arrest claim pursuant to the Fourth Amendment.  For the reasons discussed below, this cause of action does not give rise to a Fourteenth Amendment equal protection or due process claim, nor a Fifth Amendment due process claim.

In Count III, plaintiff alleges defendants unlawfully detained and maliciously charged him, depriving him of the right to be free from unreasonable searches and seizures, all in violation of the Fourth and Fourteenth Amendments.  This cause of action is liberally construed to allege a malicious prosecution claim pursuant to the Fourth Amendment.  For the reasons discussed below, this cause of action does not give rise to any claim under the Fourteenth Amendment.

In Count IV, plaintiff alleges defendants illegally stopped him from his freedom of movement, illegally searched and seized him, and deprived him of the right to be free from unreasonable searches and seizures, all in violation of the Fourth and Fourteenth Amendments.  This cause of action is liberally construed to allege illegal search and seizure and false arrest (which would be duplicative) claims pursuant to the Fourth Amendment.  For the reasons discussed below, this cause of action does not give rise to any claim under the Fourteenth Amendment.

In <u>Count V</u>, plaintiff alleges defendants deprived him of medical treatment and equal protection of the laws, all in violation of the Fifth and Fourteenth Amendments. This cause of action is liberally construed to allege a <u>medical indifference claim pursuant to the Fourteenth Amendment</u>. For the reasons discussed below, this cause of action does not give rise to a Fourteenth Amendment equal protection or due process claim, nor a Fifth Amendment due process claim.

Plaintiff's state law claims are pleaded a bit clearer. In <u>Count VI</u>, plaintiff asserts a claim for <u>assault and battery</u> under New York law. In <u>Count VII</u>, plaintiff asserts claims for <u>false arrest</u> and <u>malicious prosecution</u> under New York law.

In accordance with the above construction of the amended complaint, brief mention will be given to those claims for which plaintiff may have asserted certain constitutional violations, but for which he simply cannot proceed under any set of facts.

### C. Impact of Plaintiff's Guilty Plea

As a preliminary matter, defendants—citing the Certificate of Disposition establishing plaintiff's plea of guilty to a charge of Criminal Possession of a Weapon in the fourth degree, a class A misdemeanor, in full satisfaction of the Obstructing Governmental Administration charge (and other charges stemming from other arrests on other dates)—argue that plaintiff's "plea[] to the charges for which he was arrested" forecloses his malicious prosecution claim. Defs'. Mem. of Law, 15. Though defendants do not raise it, the impact of plaintiff's guilty plea on his false arrest claim will also be considered.

As a general rule, "[w]here the civil rights plaintiff has been convicted of the offense for which he was arrested, [the Second Circuit has] in effect accepted the fact of that conviction as conclusive evidence of the good faith and reasonableness of the officer's belief in the

lawfulness of the arrest."  Cameron v. Fogarty, 806 F.2d 380, 388 (2d Cir. 1986).  However, here, plaintiff's § 1983 claim is based on a charge (Obstruction of Governmental Administration, stemming from an October 11, 2013 arrest) that—although covered by a guilty plea to another charge—did not arise out of the same events or arrest that led to the charge (Criminal Possession of a Weapon) to which he pleaded guilty.

Recently, the Southern District of New York considered a § 1983 suit with a similar set of circumstances wherein there were multiple charges stemming from multiple arrests. Vincent v. Winski, No. 14-CV-7744, 2018 WL 1441370 (S.D.N.Y.  Mar. 22, 2018).  In that case, the charges that formed the basis for the instant civil rights claims were referred to as the "Remaining Charges" while the charge that the plaintiff pleaded guilty to was referred to as the "September 24 charge."  Id. at *4.  In noting the well-settled precedent following Cameron v. Fogarty, the Southern District explained that "[p]ut simply, the logical foundation of such a rule [foreclosing civil rights claims] does not easily apply to charges that were merely disposed of as part of that same plea bargain but otherwise bear no relation to the particular events and arrest for which the civil rights plaintiff pled guilty."  Vincent, 2018 WL 1441370, at *7.

The Court went on to find:

> Absent case law to the contrary and even considering the finality otherwise granted to plea bargains, I do not find that a civil rights plaintiff concedes the lawfulness of an arrest where, as here, his guilty plea was to an entirely different charge stemming from entirely different events that occurred on different dates from the date of the offense to which the plaintiff pled guilty.

Id. at *8.  The Southern District's decision "accords with the more logical approach . . . to consider as a total transaction whether the activity forming the basis for the arrest is the same as the activity to which the defendant pleaded guilty."  Id. (internal quotations omitted).  The

Court found that "[n]othing in the Amended Complaint, certificates of disposition, or transcript indicates that Plaintiff's agreement to consolidate the Remaining Charges with the September 24 charge and deem them covered by his guilty plea amounted to an admission of guilt with respect to the underlying conduct related to the Remaining Charges." Id.

Such is the case here:  nothing in the Certificate of Disposition or elsewhere in the record indicates that Savatxath's agreement to consolidate his outstanding charges with the September 9, 2014, weapon and drug charges and deem them covered by his guilty plea to Criminal Possession of a Weapon in the fourth degree amounted to an admission of guilt with respect to the underlying conduct related to the Obstruction of Governmental Administration charge, or the other two separate Petite Larceny charges.  Further, as in the recent Southern District case, "[d]efendants have not cited any case law holding that a guilty plea that covers or is taken in satisfaction of unrelated charges implies the lawfulness of those underlying unrelated arrests." Id.  Therefore, to the extent defendants submit plaintiff's instant civil rights claims are barred by his guilty plea, that argument is rejected and the claims will proceed to consideration under the applicable substantive legal standards.

### D.    Fourth Amendment and State Law Claims

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

1.    **Illegal Search and Seizure Claim**:  **Count IV**

Plaintiff asserts a claim for illegal search and seizure in violation of the Fourth

Amendment (Count IV).

"'[T]he Fourth Amendment requires that an officer making a traffic stop have probable

cause or reasonable suspicion that the person stopped has committed a traffic violation or is

otherwise engaged in or about to be engaged in criminal activity.'"  United States v. Wilson,

699 F.3d 235, 242 (2d Cir. 2012) (quoting United States v. Harrison, 606 F.3d 42, 45 (2d Cir.

2010)).  A warrant is not required.  See, e.g., Whren v. United States, 517 U.S. 806, 819

(1996).

Probable cause to make a stop exists when an officer "has knowledge or reasonably

trustworthy information of facts and circumstances that are sufficient to warrant a person of

reasonable caution in the belief that the [suspect] has committed or is committing a crime."

United States v. Delossantos, 536 F.3d 155, 158-59 (2d Cir. 2008).  "Reasonable suspicion

requires 'some minimal level of objective justification' for suspecting criminal activity."  United

States v. Bristol, 819 F. Supp. 2d 135, 141 (E.D.N.Y. 2011) (quoting United States v.

Sokolow, 490 U.S. 1, 7 (1989)).  "While 'reasonable suspicion' is a less demanding standard

than probable cause and requires a showing considerably less than preponderance of the

evidence, the Fourth Amendment requires at least a minimal level of objective justification for

making the stop."  Illinois v. Wardlow, 528 U.S. 119, 123-24 (2000) (quoting Sokolow, 490

U.S. at 7).

"An individual's presence in an area of expected criminal activity, standing alone, is not

enough to support a reasonable particularized suspicion that the person is committing a

crime . . . [however,] officers are not required to ignore the relevant characteristics of a

location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." Wardlow, 528 U.S. at 124. Courts in this Circuit have found one relevant factor in developing reasonable suspicion is whether an area is known by officers to be a high-crime area. See, e.g., United States v. Williams, 526 F. App'x 29, 32 (2d Cir. 2013) (summary order) (finding reasonable suspicion in part because an officer observed the defendant engaged in unusual behavior at night in a high-crime area).

Here, P.O.s Burns and Barta state that they were conducting surveillance in a location known for steady drug activity. They observed a vehicle and behavior consistent with the purchasing and/or selling of drugs. First, the vehicle was parked in the northern lot of Weis Market with only a male sitting in the front passenger seat. Second, the vehicle was parked in an area of the lot fairly far from the store entrance despite available spots closer. Third, after circling back, they witnessed the vehicle being operated by a female and with an additional male passenger in the rear, then exiting the southern lot. The officers began following the vehicle. However, there is no need to decide whether the totality of those circumstances are sufficient for a finding of reasonable suspicion to conduct a traffic stop because as they followed, P.O. Burns observed that the driver's view was obstructed as a result of an object hanging from the rear view mirror. He then conducted a traffic stop based on that violation of the traffic law. Plaintiff has not offered any admissible evidence to create a disputed issue of fact with respect to the defendants' basis for conducting the traffic stop. As "[a] seizure for a traffic violation justifies a police investigation of that violation," the traffic stop was permissible. Rodriguez v. United States, ___ U.S. ___ , 135 S.Ct. 1609, 1614 (2015).

"[A] relatively brief encounter, a routine traffic stop is more analogous to a so-called Terry stop . . . than to a formal arrest." Id. (internal quotations omitted).  "Like a Terry stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's mission—to address the traffic violation that warranted the stop and attend to related safety concerns." Id. (internal quotations and citations omitted).  "An officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop." Id. at 1615.  "But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." Id.  "The typical inquiries involved in a traffic stop include 'checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance.'" United States v. Lewis, 712 F. App'x 83, 84 (2d Cir. 2018) (summary order) (quoting Rodriguez, 135 S.Ct. at 1615).  "Without independent reasonable suspicion of other crimes, an officer cannot prolong an otherwise lawful traffic stop beyond the time it takes to carry out the traffic stop's typical inquiries." Id. (internal quotations omitted).

After effecting the vehicle stop, the driver identified herself as Nora.  P.O. Burns checked her driver's license, which came back as revoked.  At or around this time, P.O. Demer, fresh on the scene, asked plaintiff for his identification, which he provided.  After Nora stepped out of the vehicle per defendants' request, she allegedly told defendants that she picked up plaintiff to conduct a drug deal.  At or around the same time, front seat passenger Stanley also allegedly advised defendants that plaintiff was in the vehicle to conduct a drug deal.  At this time, based on the totality of the circumstances, defendants had at a minimum, a reasonable suspicion that criminal activity in addition to the traffic violation was afoot, and

their decision to prolong the stop beyond the time it took to process the traffic infraction and continue investigating did not violate plaintiff's Fourth Amendment rights.

Though the evidence must be taken in a light most favorable to plaintiff and all inferences drawn in his favor, he has not submitted any admissible evidence creating a disputed material fact relating to defendants' allegation that he was a suspect in a narcotics investigation. While he has made allegations that Stanley and/or Nora lied or that P.O. Demer fabricated their admissions pointing the finger at him, he has failed to submit evidence of same by anyone with personal knowledge. Nor has he even asserted that he was present and within hearing distance for the entirety of the officers' conversations with Nora and Stanley such that he could testify to the absence of those alleged admissions. As such, defendants have established that they believed him to be a suspect in a narcotics investigation and that they requested he exit the vehicle for further questioning. Accordingly, Savatxath's prolonged seizure did not violate the Fourth Amendment.

To the extent Savatxath alleges P.O. Demer performed an unlawful search after removing him from the vehicle, "officers may perform searches incident to constitutionally permissible arrests in order to ensure their safety." Virginia v. Moore, 553 U.S. 164, 176 (2008). Because, as explained more fully below, plaintiff's arrest was lawful, P.O. Demer was permitted to search plaintiff incident to that arrest.

Accordingly, defendants are entitled to summary judgment on plaintiff's claim of an illegal search and seizure and Count IV will be dismissed. As such, there is no need to consider qualified immunity for the illegal search and seizure claim.

**2.** **False Arrest and False Imprisonment Claims**: **Counts II** and **VII**

Plaintiff asserts claims for false arrest in violation of the Fourth Amendment (Count II) and New York law (Count VII).

Claims for "false arrest" and "false imprisonment" are "synonymous" under New York law, and both are "substantially the same" as a § 1983 claim for false arrest brought pursuant to the Fourth Amendment.  Jackson v. City of N.Y., 939 F. Supp. 2d 235, 248 (E.D.N.Y. 2013).  "Under New York law, an action for false arrest requires that the plaintiff show that (1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged."  Ackerson v. City of White Plains, 702 F.3d 15, 19 (2d Cir. 2012).  Defendants concede the first three elements; therefore, the only issue is whether the confinement was "otherwise privileged."

"To avoid liability for a claim of false arrest, an arresting officer may demonstrate that either (1) he had probable cause for the arrest, or (2) he is protected from liability because he has qualified immunity."  Simpson v. City of N.Y., 793 F.3d 259, 265 (2d Cir. 2015).  "A police officer has probable cause to arrest when he has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'"  Jackson, 939 F. Supp. 2d at 249 (quoting Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996)).

"The test for probable cause is an objective one and 'depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest.'"  Yorzinski v. City of N.Y., 175 F. Supp. 3d 69, 75 (S.D.N.Y. 2016) (quoting Zellner v. Summerlin, 494 F.3d 344, 369 (2d Cir. 2007)).  "An arresting officer thus does not have a

'duty . . . to investigate exculpatory defenses offered by the person being arrested or to assess the credibility of unverified claims of justification before making an arrest."  Id. at 76 (quoting Jocks v. Tavernier, 316 F.3d 128, 135-36 (2d Cir. 2003)).  "At the same time, however, the Second Circuit has recognized that 'the failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause.'"  Id. (quoting Manganiello v. City of N.Y., 612 F.3d 149, 161 (2d Cir. 2010)).

Defendants contend probable cause existed to arrest Savatxath for Obstructing Governmental Administration in the second degree because plaintiff, the suspect in a narcotics investigation, refused to exit the vehicle when asked and repeatedly fell down when officers removed him and attempted to handcuff him outside the vehicle.  As relevant here, "[a] person is guilty of obstructing governmental administration when he intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference . . . ."  N.Y. Penal Law § 195.05.

Against this backdrop, defendants' motion for summary judgment on the federal and state false arrest claims will be granted.  The parties vigorously dispute what Nora and Stanley said, but as explained above, plaintiff has offered no admissible evidence to create a disputed issue of fact with respect to the accusations against him.  Defendants have established that they believed him to be a suspect in a narcotics investigation and that they requested he exit the vehicle for further questioning.

On that foundation, a review of the records supports the conclusion that the officers involved could reasonably have determined that Savatxath's inaction (to exit the vehicle) was undertaken with intent to obstruct, impair or pervert the administration of law or other

governmental function or prevent or attempt to prevent a public servant from performing an official function, by means of intimidation, physical force or interference.  Accordingly, defendants had probable cause to believe plaintiff committed the crime of Obstructing Governmental Administration.

Therefore, summary judgment will be granted dismissing plaintiff's false arrest and false imprisonment claims (Counts II and VII).  As such, there is no need to consider qualified immunity for these claims.

### 3. Excessive Force and Assault and Battery Claims:  Counts I and VI

Plaintiff asserts claims for excessive force in violation of the Fourth Amendment (Count I) and assault in battery in violation of New York law (Count VI).

"The Fourth Amendment prohibits the use of unreasonable and therefore excessive force by a police officer in the course of effecting an arrest." Tracy v. Freshwater, 623 F.3d 90, 96 (2d Cir. 2010).  "Federal excessive force claims and state law assault and battery claims against police officers are nearly identical." Graham v. City of N.Y., 928 F. Supp. 2d 610, 624 (E.D.N.Y. 2013).[13]

For either type of claim to succeed, a plaintiff must ultimately demonstrate that the defendant's use of force was "objectively unreasonable 'in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" Hershey v. Goldstein, 938 F. Supp. 2d 491, 519 (S.D.N.Y. 2013) (quoting Maxwell v. City of N.Y., 380 F.3d 106, 108 (2d Cir. 2004)).  "'If the force used was unreasonable and excessive,

---

[13] "If anything, state law assault and battery claims are more plaintiff friendly, because under New York law [i]f an arrest is determined to be unlawful, any use of force against a plaintiff may constitute an assault and battery, regardless of whether the force would be deemed reasonable if applied during a lawful arrest." Hulett v. City of Syracuse, 253 F. Supp. 3d 462, 491 n.9 (May 30, 2017) (citing Graham, 928 F. Supp. 2d at 624) (internal quotations omitted).

the plaintiff may recover even if the injuries inflicted were not permanent or severe.'" Id.

(quoting Robison v. Via, 821 F.2d 913, 924 (2d Cir. 1987)).

     This "objective reasonableness" inquiry is "necessarily case and fact specific and

requires balancing the nature and quality of the intrusion on the plaintiff's Fourth Amendment

interests against the countervailing governmental interests at stake." Tracy, 623 F.3d at 96

(citing Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 123 (2d Cir. 2004). Thus, review

is "guided by consideration of at least three factors:  (1) the nature and severity of the crime

leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the

officer or others, and (3) whether the suspect was actively resisting arrest or attempting to

evade arrest by flight." Tracy, 623 F.3d at 96 (citing Graham v. Connor, 490 U.S. 386, 396

(1989)).

     Notably, an officer may be justified in removing, even forcibly, a driver or passenger

from a vehicle if he or she will not leave the vehicle on their own. See e.g., Smith v. City of

New Haven, 166 F. Supp. 2d 636, 642 (D. Conn. 2001) (citing Lennon v. Miller, 66 F.3d 416,

426 (2d Cir. 1995)).  In some cases, the intrusion on a plaintiff's Fourth Amendment rights, if

any, is extremely limited.  Id.  Or, an officer may be entitled to qualified immunity for such

conduct if it was "objectively reasonable for [the officer] to believe that in pulling the plaintiff

from the car to effect her arrest, he was not infringing on her Fourth Amendment rights."  Id.

     Importantly, on an excessive force claim, a court must evaluate the record "'from the

perspective of a reasonable officer on the scene, rather than with the 20/20 vision of

hindsight.'" Tracy, 623 F.3d at 96 (quoting Jones v. Parmley, 465 F.3d 46, 61 (2d Cir. 2006)).

In so doing, it is important to "make 'allowance for the fact that police officers are often forced

to make split-second judgments—in circumstances that are tense, uncertain, and rapidly

evolving—about the amount of force that is necessary in a particular situation.'" Id.

"Accordingly, police receive a fairly wide zone of protection in close cases involving potential

danger, emergency conditions, and other exigent circumstances." Lin v. Cnty. of Monroe, 66

F. Supp. 3d 341, 358 (W.D.N.Y. 2014) (citation omitted).  However, "granting summary

judgment against a plaintiff on an excessive force claim is not appropriate unless no

reasonable factfinder could conclude that the officers' conduct was objectively unreasonable."

Amnesty Am., 361 F.3d at 123.

    With these parameters in mind, defendants' motion for summary judgment on these

claims will be denied.  Defendants, for their part, try to paint the incident as one in which

plaintiff was a drug dealing, uncooperative, belligerent passenger, on the verge of fleeing the

scene, who pulled away and resisted P.O. Demer's attempt to remove him from the vehicle.

However, drawing all reasonable inferences in plaintiff's favor, he posed no immediate threat

to the safety of the officers or others and was not actively resisting arrest or attempting to

evade arrest by flight.  He at most resisted defendants' efforts to coax him out of the vehicle.

While defendants *may* have been justified in the sole act of forcibly removing him from the

vehicle, any such passive or mild resistance by plaintiff would not justify the sequence of

events that, according to plaintiff, followed, including the assault outside the vehicle.

    Further, neither the alleged conduct justifying the initial intervention—an obstructed

rear view mirror—nor the primary alleged crime identified by defendants as resulting from that

interaction—plaintiff's refusal to exit the vehicle upon defendants' suspicion that he

possessed drugs—can be fairly described as "serious."  Indeed, Obstructing Governmental

Administration in the second degree is a class A misdemeanor under N.Y. Penal Law

section 195.05, and is therefore an offense for which a sentence in excess of 15 days may be imposed but which a sentence of imprisonment in excess of one year cannot be imposed.

Importantly, according to Savatxath, P.O. Demer violently yanked him out of the vehicle, slammed him against the trunk, and maliciously threw him to the ground face first. He and P.O. Burns then proceeded to place their weight on top of plaintiff's back and physically assault him, including punching, elbowing, kneeing, and beating him brutally, and placing him in a choke hold.  This went on for at least five minutes, during which time defendants continued to pull and twist plaintiff and yell racial slurs.  Savatxath was handcuffed during the entire alleged attack.

Defendants point out that during plaintiff's state court suppression hearing, when he was asked, "To be fair, could they have been trying to handcuff you at this point?," plaintiff responded "Yeah."  Pl.'s SMF ¶ 65.  Moreover, defendants argue that plaintiff sustained no injuries and did not seek immediate medical attention.

Plaintiff later explained that "to be fair," he was frustrated by the Assistant District Attorney's (Mr. Brown's) questions at the hearing and that is why he answered the way he did.  Id. ¶¶ 131, 138.  With respect to his injuries, a plaintiff may recover on an excessive force claim "even if the injuries inflicted were not permanent or severe," Hershey, 938 F. Supp. 2d at 519, and plaintiff contends that he did not seek medical attention for his injuries until five days later because he was convinced that the Binghamton General Hospital Emergency Department would not treat him for his injuries because they have ties with the Binghamton Police Department, Pl.'s SMF ¶ 140.

Defendants have not met their burden to demonstrate that no material fact exists relative to plaintiff's excessive force and assault and battery claims.  Construing the evidence

in a light most favorable to plaintiff and drawing all inferences in his favor, a fair minded jury could return a verdict for plaintiff and thus summary judgment is inappropriate.

Defendants' request for qualified immunity on these claims will also be denied at this stage.  "[A] decision dismissing a claim based on qualified immunity at the summary judgment stage may only be granted when a court finds that an official has met his or her burden demonstrating that no rational jury could conclude '(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.'"  Coollick v. Hughes, 699 F.3d 211, 219 (2d Cir. 2012) (quoting Ashcroft v. al–Kidd, 563 U.S. 731, 735 (2011)).

Importantly, however, "[s]ince the law in this area is well-established, 'in Fourth Amendment unreasonable force cases, unlike in other cases, the qualified immunity inquiry is the same as the inquiry made on the merits.'"  Washpon v. Parr, 561 F. Supp. 2d 394, 408 (S.D.N.Y. 2008) (quoting O'Bert ex rel. Estate of O'Bert v. Vargo, 331 F.3d 29, 37 (2d Cir. 2003)).  Although in some cases an officer may nevertheless still be shielded by qualified immunity if his conduct "falls in the sometimes hazy border between excessive and acceptable force," these facts do not fit that bill.  Hartman v. Cnty. of Nassau, 350 F. App'x 477, 479 (2d Cir. 2009) (summary order) (citation and internal quotation marks omitted); see also Franks v. New Rochelle Police Dep't, 2015 WL 4922906, at *16 (S.D.N.Y. Aug. 18, 2015) (declining to resolve qualified immunity issue on summary judgment where "the Court [was] unable to determine whether [defendant's] actions were objectively reasonable in light of the legal rules that were clearly established at the time [they were] taken").

Accordingly, defendants' motion for summary judgment will be denied on these claims and plaintiff's § 1983 excessive force and state law assault and battery claims will remain for trial.  Defendants' request for qualified immunity will likewise be denied.

### 4.    **Malicious Prosecution Claims**:  **Counts III** and **VII**

Plaintiff asserts claims for malicious prosecution in violation of the Fourth Amendment (Count III) and New York law (Count VII).

"Claims of malicious prosecution arising under Section 1983 are governed by the same standard applied under state law."  Frederique v. Cnty. of Nassau, 168 F. Supp. 3d 455, 477 (E.D.N.Y. 2016) (citing Russell v. Smith, 68 F.3d 33, 36 (2d Cir. 1995)).  To prevail on a claim of malicious prosecution, a plaintiff must establish:  (1) the initiation of a proceeding, (2) its termination favorably to plaintiff, (3) lack of probable cause, and (4) malice.  Savino v. City of N.Y., 331 F.3d 63, 72 (2d Cir. 2003).  In addition, a § 1983 malicious prosecution claim requires that "there must be a seizure or other perversion of proper legal procedures implicating the claimant's personal liberty and privacy interests under the Fourth Amendment."  Washington v. Cnty. of Rockland, 373 F.3d 310, 316 (2d Cir. 2004).

Defendants' motion for summary judgment as to these claims will be granted.  In particular, the parties raise arguments as to whether Savatxath can satisfy the second and third elements of these claims.  With respect to the "favorable termination" element, plaintiff contends that he "did not plead guilty to the charge of Obstructing Governmental Administration @ all in Village Endicott Court; which they have No Jurisdiction to this charge.  This charge was Dismissed by the Broome County District Attorney Office."  Pl.'s SMF ¶ 121.  In support of his contention, plaintiff has submitted the same Certificate of Disposition submitted by defendants.  The Certificate of Disposition shows that on September 9, 2014, in

Endicott Village Court, Broome County, New York, plaintiff pleaded guilty to and was sentenced on the reduced charge of New York Penal Law section 265.01 Criminal Possession of a Weapon in the fourth degree, a Class A misdemeanor, in full satisfaction of three outstanding cases including the Obstructing Governmental Administration charge stemming from the instant October 11, 2013 incident.

Plaintiff has not and cannot show that the prosecution for the instant charge terminated in his favor.  Rather, he alleges that he did not plead guilty to the charge and that the sentencing court lacked jurisdiction.  As noted above, the Certificates of Disposition demonstrates that the Obstructing Governmental Administration charge was consolidated along with several other charges and deemed covered under plaintiff's guilty plea to a reduced version of one of those charges.  These circumstances do not show that the prosecution terminated in plaintiff's favor.  See e.g., Vincent, 2018 WL 1441370, at *11.

Moreover, as explained above, plaintiff cannot establish a lack of probable cause for his arrest on the Obstructing Governmental Administration charge and thus his malicious prosecution claim fails on that basis as well.

Accordingly, summary judgment will be granted dismissing those claims (Counts III and VII).  As such, there is no need to consider qualified immunity for the malicious prosecution claims.

### E.    Fourteenth Amendment Claims

The Fourteenth Amendment states in relevant part that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV § 1.

1.    <u>Medical Indifference Claim</u>:  <u>Count V</u>

Plaintiff asserts a claim for deliberate indifference of his medical needs in violation of the Fourteenth Amendment (<u>Count V</u>).

Historically, a § 1983 claim alleging deliberate indifference to a plaintiff's serious medical needs has been analyzed under a two-pronged standard.  <u>See</u> <u>V.W. by & through Willams v. Conway</u>, 236 F. Supp. 3d 554, 582 (N.D.N.Y. Feb. 22, 2017).  The first prong of this standard was objective:  "the alleged deprivation of adequate medical care must be sufficiently serious."  <u>Spavone v. N.Y. State Dep't of Corr. Servs.</u>, 719 F.3d 127, 139 (2d Cir. 2013) (internal citation and quotation marks omitted).  The second prong was long understood to be subjective:  "the charged officials must be subjectively reckless in their denial of medical care."  <u>Id</u>.

Under this well-settled approach, it made no difference whether the plaintiff was a convicted prisoner or a pre-trial detainee, since the Second Circuit had repeatedly instructed lower courts that "[c]laims for deliberate indifference to a . . . serious threat to the health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment."  <u>Caiozzo v. Koreman</u>, 581 F.3d 63, 72 (2d Cir. 2009), <u>overruled in part by</u> <u>Darnell v. Pineiro</u>, 849 F.3d 17 (2d Cir. 2017).

Recently, however, the Second Circuit has changed course.  In <u>Darnell</u>, the Court overruled in part <u>Caiozzo</u>, observing that the "subjective prong" of a § 1983 deliberate indifference claim asserted by a pre-trial detainee is "perhaps better classified as a 'mens rea prong' or 'mental element prong.'"  <u>Id</u>. at 29.  Accordingly, the Court concluded that "deliberate indifference" in the Fourteenth Amendment context should be "defined

objectively," meaning that the "Due Process Clause can be violated [even] when an official does not have subjective awareness that the officials acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm." Id. at 35.  In other words, rather than ask whether the defendant "kn[ew] of and disregard[ed] an excessive risk to [ ] health or safety," the appropriate inquiry under the Fourteenth Amendment is whether the defendant "knew, or should have known" that his conduct "posed an excessive risk to health or safety." Id. at 33, 35.

To show a denial of medical care is "sufficiently serious," a plaintiff must show that his "medical need was a condition of urgency, one that may produce death, degeneration, or extreme pain." Johnson v. Wright, 412 F.3d 398, 403 (2d Cir. 2005) (internal quotations omitted).  Factors that should be considered in assessing whether a medical need is sufficiently serious include:  "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.'" Brock v. Wright, 315 F.3d 158, 162 (2d Cir. 2003) (quoting Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)).

After carefully considering the parties' briefing in light of this standard, the deliberate indifference claim will be dismissed.  First, with respect to any claim that Savatxath was denied medical attention for his cataplexy, it is irrelevant for purposes of this discussion whether he in fact suffers from cataplexy because the undisputed facts show that he did not allege he had an actual medical need or identify any treatment that he needed as a result of his alleged cataplexy.  At best, plaintiff has alleged that he told officers, minimally P.O. Barta,

simply that he suffers from cataplexy. He has not sufficiently established a deliberate indifference claim based on his cataplexy.

With respect to Savatxath's claim that he was denied medical attention after the alleged assault, plaintiff alleges his face was covered with blood, he had lacerations above his head, and he suffered cuts, abrasions, contusions, and back injuries. He contends that following the assault, he requested an ambulance or emergency response team be called due to the injuries he sustained during the assault but that his request was denied. Following his subsequent interview at the police station, Savatxath again requested medical treatment and was denied. He requested medical treatment one to two more times a short time later which is when P.O. Demer advised he could walk to the hospital when he was released.

However, plaintiff did not allege how long his face or head was bleeding, or describe any pain associated with his alleged injuries. He notes that his back injuries were "later known to be sciatic nerve pain" but does not describe the pain he was in when he was requesting medical treatment. Even taking the facts in the light most favorable to him, plaintiff's alleged injuries were far from life-threatening and his wait for treatment was far from long; plaintiff's entire detainment on October 11, 2013, lasted approximately five hours and after he was free to go, he did not seek medical treatment until at least five days later. Thus, even viewing his pro se allegations with leniency, the allegations fail to allege a serious medical need. See Watson v. Doe, No. 115CV1356BKSDEP, 2016 WL 347339, at *3 (N.D.N.Y. Jan. 28, 2016) (Sannes, J.) (citing Munlyn v. Pietrie, No. 13-CV-6170FPG, 2014 WL 3695488, at *6 (W.D.N.Y. July 24, 2014) (finding that the complaint failed to allege a serious medical condition where only the allegation was that the plaintiff "was in pain," and there were no allegations regarding, among other things, "the level or extent of the pain . . .

any resulting inability to engage in normal activities, or any harm consequently experienced or likely to occur.")).

Because plaintiff cannot show that he had sufficiently serious medical needs and was denied treatment, there is no need to consider whether defendants knew, or should have known that their conduct in denying or withholding medical treatment posed an excessive risk to plaintiff's health or safety. Accordingly, defendant's motion for summary judgment on Savatxath's deliberate indifference claim will be granted and <u>Count V</u> will be dismissed. It follows that there is no need to consider qualified immunity for the deliberate indifference claim.

### 2. **Equal Protection Claims**

Turning to the remaining claims, as best as they can be discerned, <u>Counts I</u>, <u>II</u>, and <u>V</u> contain the phrase "equal protection of the laws." However, it is unclear in what manner plaintiff claims he was deprived of equal protection of the laws.

The relevant Equal Protection Clause is contained in the Fourteenth Amendment. That portion of the Fourteenth Amendment provides:

> No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend. XIV § 1.

The Equal Protection Clause "is basically a direction that all persons similarly situated should be treated alike." <u>City of Cleburne v. Cleburne Living Center</u>, 473 U.S. 432, 439 (1985). In order to prevail on an equal protection claim, a plaintiff must establish that (1) he was treated differently than others similarly situated, and (2) this differential treatment was

motivated by an intent to discriminate on the basis of race, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person. Diesel v. Town of Lewisboro, 232 F.3d 92, 103 (2d Cir. 2000).

Savatxath makes reference to race several times in the amended complaint: he asserts that is Asian-American; both front seat passengers were Caucasian; P.O. Demer directed racial slurs at him during the alleged altercation, including telling plaintiff to "Stop Faking it you Cry Baby Gook" numerous times, Am. Compl. ¶ 47; P.O. Demer told plaintiff, "Don't worry Gook, they gonna take good care of you in prison" while transporting him to the police station, id. ¶ 68; and finally, plaintiff told P.O. Demer in the interview room that defendants "Racial Profile," id. ¶ 75.

While the amended complaint identifies plaintiff's race and alleges statements which, if true, would surely demonstrate P.O. Demer's racial animus or bias, Savatxath fails to allege that similarly situated individuals of a different race were treated differently. "Plaintiff's legal conclusion that he was targeted because of his race is not support[ed] by factual allegations," much less any evidence at the summary judgment stage, to maintain a Fourteenth Amendment Equal Protection claim. See Savatxath v. Stoeckel, No. 3:10-CV-1089, 2011 WL 1790159, at *4–5 (N.D.N.Y. May 10, 2011) (McAvoy, S.J.).

To the extent plaintiff has attempted to assert a Fourteenth Amendment equal protection claim in the amended complaint, it will be dismissed.

### 3.    Due Process Claims

Similar to plaintiff's insufficiently pleaded equal protection claims, Count I contains reference to "due course of justice"[14] and Count II "due process," with both causes of action citing the Fourteenth Amendment.  Those allegations will be read to assert a due process violation.

"[T]he Due Process Clause of the Fourteenth Amendment prohibits the States . . . from depriving any person of property without 'due process of law.'"  Dusenbery v. United States, 534 U.S. 161, 167 (2002).  The Due Process Clause protects both procedural and substantive rights.  Plaintiff does not distinguish between substantive and procedural due process.

The procedural component of the Due Process Clause prevents the deprivation of a protected interest absent the provision of sufficient procedural protections.  To establish a procedural due process claim, a plaintiff must identify a protected property interest and show that he was deprived of that interest without due process of law.  Harrington v. Cnty. of Suffolk, 607 F.3d 31, 34 (2d Cir. 2010).  The existence of a cognizable property interest is determined by state law.  See Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972) ("Property interests . . . are not created by the Constitution.  Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits").

---

[14]  It is unclear what exactly plaintiff means in alleging that defendants' "impeded the due course of justice, in violation of the Fifth and Fourteenth Amendments" as it relates to the alleged assault, or as plaintiff calls it, the "physical abuse."  Am. Compl. ¶ 90.  Since a due process violation is asserted in Count II, Count I will also be analyzed under the due process standard.

Here, plaintiff was of course detained at the side of the road and back at the police station, which necessarily deprived him of his liberty. He alleges he was deprived of that liberty without due process. Am. Compl. ¶ 48. However, it is unclear what facts support this claim or what process Savatxath claims he was denied, other what he alleges was due to him relative to his arrest and detainment, and those facts comprise the Fourth Amendment claims previously discussed. Accordingly, he has failed to make out a procedural due process claim and any such claim will be dismissed.

With respect to substantive due process, "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." United States v. Lanier, 520 U.S. 259, 272 n.7 (1997)); see also Albright v. Oliver, 510 U.S. 266, 273 (1994) ("Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.") (internal quotations omitted). It follows that any substantive due process claim based on the same facts that make up a specific constitutional violation must be dismissed.

Therefore, to the extent the amended complaint could be construed to raise a due process claim based on plaintiff's seizure or subsequent criminal proceedings, such a claim arises out of the same circumstances as the illegal search and seizure, false arrest, and malicious prosecution claims under the Fourth Amendment and must be dismissed as duplicative. See e.g., Snow v. Vill. of Chatham, 84 F. Supp. 2d 322, 327 (N.D.N.Y. 2000) (dismissing Fourteenth Amendment due process claim "since the Fourth Amendment, and

not some generalized concept of substantive due process, provides the constitutional

foundation for false arrest claims"); see also Conte v. Cnty of Nassau, No. 06–CV–4746,

2008 WL 905879, at *14, at *44, n.12 (E.D.N.Y. Mar. 31, 2008) (collecting cases) ("Because

the Fourth Amendment provides the source for a claim under Section 1983 premised upon an

alleged unlawful arrest and imprisonment or an allegedly malicious prosecution, plaintiff

cannot state a substantive due process claim against defendants."); Cane v. New Britain

Police Dep't, No. 3:16-CV-1638, 2017 WL 752278, at *4 (D. Conn. Feb. 27, 2017)

("[Plaintiff's] claims of false arrest, excessive force, unreasonable search and seizure and

destruction of property in connection with the illegal entry onto his property are all covered by

the Fourth Amendment's protections against unlawful searches and seizures.  Therefore, [he]

cannot state a Fifth Amendment substantive due process claim.").

Likewise, to the extent the amended complaint could be interpreted to raise a due

process claim based on P.O. Demer and/or P.O. Burns' assault on plaintiff, such a claim

arises out of the same circumstances as the excessive force claim under the Fourth

Amendment and must be dismissed as duplicative.  See e.g., Raymond v. Bunch, 136 F.

Supp. 2d 71, 81 (N.D.N.Y. 2001) (dismissing substantive due process claim as duplicative of

excessive force claim).  The same holds true for any substantive due process claim

stemming from the same facts as plaintiff's deliberate indifference claim.  See e.g., Graham,

490 U.S. at 395 (generalized notion of substantive due process under Fourteenth

Amendment not applicable where other amendment provides explicit textual source of

constitutional protection against alleged government conduct).

For these reasons, plaintiff cannot support a substantive due process claim and any

such claim will be dismissed.

### F.    Fifth Amendment Claims

As with plaintiff's insufficiently pleaded Fourteenth Amendment equal protection and due process claims, Counts I, II, and V cite the Fifth Amendment but fail to assert cognizable claims.

The Fifth Amendment states in relevant part that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law . . . ."  U.S. Const. amend. V.  "The Due Process Clause of the Fifth Amendment prohibits the United States . . . from depriving any person of property without 'due process of law.'"  Dusenbery, 534 U.S. at 167.  Plaintiff's amended complaint has been filed against state actors, not the federal government.  In such circumstances, a "[plaintiff's] appeal to rights secured under the Fifth Amendment is misplaced and dismissed."  Molina v. New York, 697 F. Supp. 2d 276, 284 (N.D.N.Y. 2010) (Kahn, J.); see also Villafane v. Sposato, No. CV 16-3674, 2017 WL 4179855, at *22 (E.D.N.Y. Aug. 22, 2017), report and recommendation adopted sub nom., 2017 WL 4157220 (E.D.N.Y. Sept. 15, 2017).

For this reason, plaintiff cannot maintain any Fifth Amendment claims and any attempt at such will be dismissed.

### G.    Failure to Intervene Claims

Construed liberally, plaintiff alleges that P.O. Barta failed to intervene when P.O. Demer and P.O. Burns violated his constitutional rights.

Law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence.  See e.g., Stoeckel, 2011 WL 1790159, at *5 (citing Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994)).  "Liability under § 1983 may attach to a police officer for failing to

intervene in or prevent an instance of excessive force if '(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene.'"  Kimbrough v. Town of Dewitt Police Dep't, No. 9:08CV03, 2010 WL 3724017, at *4 (N.D.N.Y. Sept. 15, 2010) (Sharpe, J.) (quoting Jean–Laurent v. Wilkinson, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008)).

Generally, "'[w]hether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.'" Kimbrough, 2010 WL 3724017, at *4 (quoting Anderson, 17 F.3d at 557).

It is undisputed that P.O. Barta was the least involved of the three defendants. According to defendants, he was a trainee accompanying P.O. Burns.  He was at the scene of the traffic stop but did little more than follow P.O. Demer's instructions to watch the passengers while P.O.s Demer and Burns questioned another passenger.

The sole factual allegations against P.O. Barta are that (1) plaintiff told him, along with the other defendants, early on in the traffic stop that he suffered from narcolepsy, cataplexy, and insomnia, (2) P.O. Barta witnessed the "unlawful attack" of plaintiff being searched and assaulted but failed to file an "Incident Police Report," id. ¶ 103; and (3) P.O. Barta knew about plaintiff's medical conditions but failed to do anything, id.  Plaintiff does not allege that P.O. Barta was personally involved in directly committing any of the alleged § 1983 or state law violations.  Therefore, any claims against P.O. Barta would be for failure to intervene.

In so much as plaintiff currently has a viable excessive force claim remaining against P.O. Demer and P.O. Burns for conduct (i.e. assaulting plaintiff) that occurred in P.O. Barta's

presence, summary judgment dismissing a failure to intervene claim is inappropriate at this stage and will be denied.  Again, the record before us does not provide the information necessary to decide these issues as a matter of law.  Specifically, the precise sequence of events during the traffic stop are not clear:  whether plaintiff pulled away or resisted after being asked to get out of the vehicle; whether P.O. Demer or P.O. Burns yanked plaintiff out of the vehicle, slammed him face first into the pavement, and continued to assault him handcuffed all while P.O. Barta was an onlooker; where P.O. Barta was in relation to the alleged assault and whether there was a reasonable opportunity for him to intervene.

Although plaintiff may have a steep hill to climb given the likely rapid succession of events that transpired, he has stated a facially viable, if thin, failure to protect claim.  See, e.g., Hickey v. City of New York, 2004 WL 2724079, at *13 (S.D.N.Y. 2004) (denying summary judgment on plaintiff's failure to protect claim despite difficulty of proving such claim at trial).  However, as defendants have shown they are entitled to judgment as a matter of law dismissing plaintiff's illegal search and seizure, false arrest, malicious prosecution, and deliberate indifference claims, those same claims under a failure to intervene theory of liability will also be dismissed as against P.O. Barta.

### H.    Americans with Disabilities Act Claim

Finally on the list of tangential claims is one based on disability.  Plaintiff does not allege any specific violations of the Americans with Disabilities Act ("ADA") but includes several mentions of his disability and medical conditions in the amended complaint.  Further, defendants have argued in support of dismissal of any such claims, so brief mention will be given to the issue.

Plaintiff alleges he suffers from the "disability of Narcolepsy, Cataplexy Attacks and Insomnia."  Am. Compl. ¶ 9.  He asserts that at the beginning of the traffic stop, he advised defendants of his disability of narcolepsy, cataplexy, and insomnia.  Further, plaintiff alleges defendants committed an "assault on a disable[d] person," id. ¶ 54, and while being transported to the police station, told P.O. Demer that they all "ignored his Disability," id. ¶ 63.  Lastly, Savatxath advised P.O. Demer while being interviewed at the station that they "Assaulted a Handicap Disable Mentally Challenge [sic] Person."  Id. ¶ 75.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132; see also Wright v. N.Y. State Dep't of Corr., 831 F.3d 64, 72 (2d Cir. 2016).  To state a claim under Title II, a plaintiff must establish:  "(1) he is a qualified individual with a disability; (2) the defendant is subject to [the ADA]; and (3) he was denied the opportunity to participate in or benefit from the defendant's services, programs, or activities, or was otherwise discriminated against by defendants because of his disability."  Disabled in Action v. Bd. of Elections in City of N.Y., 752 F.3d 189, 196-97 (2d Cir. 2014) (internal quotations omitted) (quoting McElwee v. Cnty. of Orange, 700 F.3d 635, 640 (2d Cir. 2012)).

Even assuming arguendo, that plaintiff's narcolepsy, cataplexy, and/or insomnia would qualify as a disability under the ADA, Savatxath did not allege that he was denied the opportunity to participate in or benefit from the defendants' services, programs, or activities, or was otherwise discriminated against by defendants because of his disability.  For this reason, plaintiff cannot maintain an ADA claim and any such claim will be dismissed.

## V.    **CONCLUSION**

Therefore, it is

ORDERED that

1.  All claims for money damages against defendants in their official capacities are sua sponte DISMISSED;

2.  Defendants' motion for summary judgment is GRANTED in part and DENIED in part;

3.  Defendants' motion for summary judgment is GRANTED as to plaintiff's illegal search and seizure claim (Count IV); false arrest and false imprisonment claims (Counts II and VII); malicious prosecution claims (Counts III and VII); and medical indifference claim (Count V) and those claims are DISMISSED;

4.  To the extent plaintiff asserts any equal protection or due process claims pursuant to the Fourteenth Amendment, any Fifth Amendment claim, or any claim under the Americans with Disabilities Act, those claims are sua sponte DISMISSED;

5.  Defendants' motion for summary judgment is DENIED as to plaintiff's excessive force and assault and battery claims against P.O. Demer and P.O. Burns and failure to intervene claim against P.O. Barta relating to the excessive force (Counts I and VI);

6.  This matter is referred back to United States Magistrate Judge David E. Peebles for the appointment of pro bono trial counsel; and

7.  Trial is scheduled for September 10, 2018, in Utica, New York.

IT IS SO ORDERED.

United States District Judge

Dated:  March 31, 2018
        Utica, New York.